# UNITED STATES DISTRICT COURT
## District of Kansas
(Kansas City Docket)

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                          CASE NO. 25-20099-HLT-ADM-1-2

JOSEPH CAMPBELL
and
JOHN DUNCAN,

        Defendants.

# INDICTMENT

**THE GRAND JURY CHARGES**:

At all times relevant to this Indictment:

### BACKGROUND

1. The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small

1

businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans have government-backed guarantees.

2. Defendant Joseph Campbell was a resident of Kansas. Defendant Campbell owned several real estate, development, sales and asset acquisition businesses.

3. Defendant John Duncan was a resident of Kansas. Duncan was employed by Campbell.

4. Titan Fish Partners, LLC was one of Defendant Campbell's businesses. It was organized on January 10, 2017, with Defendant Campbell listed as its resident agent and organizer.

5. Titan Fish One, LLC was another of Defendant Campbell's businesses. It was organized on October 1, 2014, with Campbell listed as the registered agent and organizer.

6. Titan Fish Two, LLC was another of Defendant Campbell's businesses. It was organized in March 2015, with Campbell listed as the organizer. It was forfeited on October 15, 2020.

7. Titan Fish Three, LLC was another of Defendant Campbell's businesses. It was organized in October 2015, with Kansas Corporation #2, Inc. listed as the organizer. It was forfeited on July 15, 2022.

8. Titan Fish Four, LLC was another of Defendant Campbell's businesses. It was organized in October 2015, with Kansas Corporation #2, Inc. listed as the organizer. It was forfeited on July 15, 2022.

9. Kansas City Cattle Co. LLC was another of Defendant Campbell's businesses. It was organized on October 1, 2014, with Campbell listed as the registered agent and organizer. It was forfeited on July 15, 2016.

10. Pate-Campbell Properties, Inc., was another of Campbell's businesses. It was registered as a corporation with the Kansas Secretary of State in 2001. Its status was forfeited in October 2020 for failure to file its annual report. Campbell was listed as its director, president, and secretary.

11. Terra Vista Development was another of Campbell's businesses. It was organized in May 2000, with Campbell listed as the only member and manager.

12. Jacobson-Campbell Excavation, Inc. was another of Campbell's businesses. It was registered as a corporation with the Kansas Secretary of State in 1999.

13. Crossings of Spring Hill, LLC was another of Campbell's businesses. It was organized in October 2005, with Campbell listed as the organizer.

14. Ewing III Land Company, LLC was another of Campbell's businesses. It was organized in August 2009, with Campbell listed as the organizer.

15. Ewing 3 Development, LLC was another of Campbell's businesses. It was organized in April 2001, with Pate-Campbell Properties, Inc. and two other entities listed as the members of the entity.

16. Rockwood at Prairie Highlands, LLC was another of Campbell's businesses. It was organized in October 2005, with Campbell listed as the organizer. It was forfeited on July 15, 2018.

17. HTCBGCC AMALFI, LLC was another of Campbell's businesses. It was

organized in May 2017, with Campbell listed as the organizer. It was forfeited on October 15, 2020.

18. CML-2015-TF, LLC, was another of Campbell's businesses. It was organized in June 2016, with Kansas Corporation #2, Inc. as the organizer.

19. CML 2015-MM-T LLC, was another of Campbell's businesses. It was organized in September 2015, with Kansas Corporation #2, Inc. as the organizer. It was forfeited on July 15, 2022.

20. Kansas Corporation #2 was a Kansas for profit corporation.

21. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020, and, among other things, was designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

22. To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business, through its authorized representative, to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the

small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses, typically this would include payroll expenses reported to the IRS by way of filed tax returns.

23. When a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

24. PPP loan proceeds were required to be used for certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities. Under the applicable PPP rules and guidance, the interest and principal on the PPP loan was eligible for forgiveness if the business spent the loan proceeds on these expense items within a designated period of time and used a certain portion of the loan towards payroll expenses.

*The Economic Injury Disaster Loan ("EIDL") Program*

25. The Economic Injury Disaster Loan ("EIDL") Program, which was administered through the Small Business Administration ("SBA"), offered loans to small business owners who had suffered an economic loss during a natural disaster. Congress expanded the financial resources of the EIDL program when it enacted the CARES Act. Under the CARES Act, the EIDL program expanded its eligibility to include loans for non-profit organizations, sole proprietors, and independent contractors. The CARES Act also authorized the SBA to provide EIDL loans up to $2 million per loan. The CARES Act

authorized the SBA to issue loan advances up to $10,000 to small entities. The amount of the advance was determined by an entity's number of employees and the advances do not have to be repaid.

26. In order to obtain an EIDL loan and/or advance, a qualifying business must have submitted an application to the SBA and provide particular information about its operations, such as the number of employees, and the gross revenues and costs of goods sold for the 12-month period preceding January 31, 2020. If the application was approved, the amount of the loan was determined, in part, on the information provided by the applicant about the employment, revenue, and cost of goods as described above. The loan applicant must also certify that all information provided in the application was true and correct to the best of the applicant's knowledge.

27. EIDL applications were submitted directly to the SBA. Further, any funds issued under an EIDL loan or advance were issued directly by the SBA. EIDL funds could be used for payroll expenses, sick leave, production costs, and fixed debts, such as utilities, rent, and mortgage payments.

## THE WIRE FRAUD SCHEME AND CONSPIRACY

28. Beginning around February 2019, Defendant Campbell hired Defendant Duncan, to work for Titan Fish Partners. Duncan's title was Construction Manager, but Campbell referred to him as CFO.

29. Beginning in and around March 2020 and continuing until at least December 28, 2020, Campbell and Ducan devised a scheme to defraud SBA by submitting PPP and EIDL loan applications that contained materially false information. As further part of the

6

scheme to defraud, Campbell used the PPP and EIDL loan proceeds for purposes other than authorized by the PPP and EIDL loan programs, including personal expenses.

29. Campbell and Duncan, through Campbell's companies, applied for twelve PPP loans. Eleven of the loans were funded, and Campbell and his companies received approximately $273,383 in PPP loan proceeds.

30. Campbell and Duncan, through Campbell's companies, applied for twenty-four EIDL loans. However, only five of the loan applications were funded, and Campbell and his companies received approximately $1,761,100 in EIDL loan proceeds.

*The false statements*

31. In the twelve PPP loan applications Campbell and Duncan submitted for Campbell's companies, they were required to state the average monthly payroll for each business on the applicable PPP loan application. The applications claimed total payroll of more than $900,000 per year for the businesses. However, the applications falsely stated the monthly payroll for each company. For instance, PPP loan applications for Titan Fish Partners, the application listed an average monthly payroll of $17,224 and $17,240 per month, which would mean the company had annual payroll expenses or more than $200,000. However, records from payroll companies used by Titan Fish Partners establish that Titan Fish Partners had an annual payroll of $51,600 in 2019 and $46,100 in 2020.

32. On or about April 27, 2020, Campbell, as managing member of Titan Fish One, LLC, applied for a PPP loan with Landmark Bank. In the PPP application, Campbell falsely claimed that Titan Fish One, LLC had average monthly payroll of approximately

$8,333. This was a false statement because, as Campbell knew, Titan Fish One, LLC had no payroll expenses at the time.

33. On or about May 9, 2020, Campbell, through Ewing III Land Company, LLC, applied for a PPP loan with Kabbage Inc. In the PPP application, Campbell falsely claimed that Ewing III Land Company, LLC had average monthly payroll of approximately $8,333. This was a false statement because, as Campbell knew, Ewing III Land Company, LLC had no payroll expenses at the time.

34. On or about January 20, 2021, Campbell, through Pate-Campbell Properties, applied for a PPP loan with Cross River Bank. In the PPP application, Campbell falsely claimed that Pate-Campbell Properties had average monthly payroll of approximately $8,333. This was a false statement because, as Campbell knew, Pate-Campbell Properties had no payroll expenses at the time. At the time Pate-Campbell was not actively engaged in business activity.

35. On or about February 24, 2021, Campbell and Duncan applied for a PPP loan through Kansas City Cattle Company, LLC with DreamSpring. At the time Kansas City Cattle Company, LLC was not actively engaged in business. In the PPP Application Campbell and Duncan falsely claimed that Kansas City Cattle Company had average monthly payroll of $8,333. As part of the PPP loan application, Duncan created a false invoice that showed cattle being purchased for $12,166.25. The invoice was false because no such sale took place. The invoice was presented as part of the PPP loan application.

Campbell and Duncan both knew there was no such sale of cattle and the invoice was fraudulent.

37. As part of the EIDL application process, Campbell communicated with SBA employees. On May 6, 2020, Campbell emailed an SBA employee and stated, "Kansas City Cattle, LLC cost of operations was $210,414 for 2019." This was a false statement.

38. Campbell submitted an EIDL loan application for Terra Vista Development. However, SBA denied the loan because the application accurately stated that Terra Vista was a real estate development company and therefore did not qualify for EIDL loans. Following this notice, Campbell made false representations to SBA about the true nature of his companies in order for them to qualify for EIDL loans. For instance, in order to qualify for an EIDL loan, Campbell falsely stated that Pate-Campbell was a custom-home builder, when Pate-Campbell actually was a real estate development company.

### *Campbell's usage of PPP and EIDL loan proceeds*

39. Instead of using the EIDL proceeds to pay for payroll expenses, sick leave, production costs, or fixed debts, such as utilities, rent, and mortgage payments, Campbell used much of the proceeds for personal expenses.

40. On May 13, 2020, using EIDL proceeds, Campbell caused a cashier's check to be paid to Olathe Dodge in the amount of $36,000. Defendant purchased a 2019 Dodge Ram 1500.

41. On May 26, 2020, Defendant used EIDL loan proceeds to purchase a piece of real property located at the Lake of the Ozarks.

42. On July 3, 2020, using EIDL proceeds, Campbell caused a cashier's check

to be paid to Olathe Ford in the amount of $22,334.81. The proceeds were used to purchase a 2017 Ford Explorer.

### *Loan forgiveness*

43.     On or about December 28, 2020, Campbell, through Titan Fish One, LLC, provided Landmark Bank, a financial institution, with a PPP Loan Forgiveness Application. In the form, Campbell sought loan forgiveness for $20,800 PPP loan. In the loan forgiveness application, Campbell falsely claimed that he had used the PPP loan to pay costs that were eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments). He also falsely claimed that the PPP loan amount included payroll costs equal to at least 60% of the forgiveness amount. In actuality, Titan Fish One, LLC did not have any payroll and was not therefore eligible for the PPP loan or for forgiveness of the PPP loan.

## COUNT 1

**Wire Fraud Conspiracy**
**[18 U.S.C. § 1349]**

44.     Paragraphs 1 through 43 are realleged and incorporated herein.

45.     Beginning on a date unknown, but no later than on or about February 24, 2020, and continuing through at least December 28, 2020, in in the District of Kansas and elsewhere, the defendants,

**JOSEPH CAMPBELL**
**and**
**JOHN DUNCAN,**

did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with each other, to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises, and by omission of material facts, well knowing and having reason to know that said pretenses were and would be false and fraudulent when made and caused to be made and that said omissions were and would be material, and, in so doing, caused interstate and foreign wire communications to be made, in furtherance of the scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

This was in violation of Title 18, United States Code, Section 1349.

## **COUNTS 2 THROUGH 7**

**Money Laundering**
**[18 U.S.C. § 1957]**

46. Paragraphs 1 through 45 are incorporated and realleged herein.

47. On or the dates listed in the table below, in the District of Kansas and elsewhere, the defendant,

### **JOSEPH CAMPBELL,**

knowingly conducted and attempted to conduct a financial transaction affecting interstate commerce, in criminally derived property of a value greater than $10,000, as set forth in the table below, such property having been derived from specified unlawful activity, that is, wire fraud conspiracy in violation of 18 U.S.C. § 1349.

11

| Count | Date | Financial transaction |
|---|---|---|
| Two | May 13, 2020 | Transfer of approximately $36,000 via cashier's check to Olathe Dodge |
| Three | May 19, 2020 | Transfer of approximately $14,000 via cashier's check payable to Campbell's spouse |
| Four | May 26, 2020 | Transfer of approximately $20,000 via cashier's check payable to Campbell's spouse |
| Five | June 1, 2020 | Transfer of approximately $16,599.99 to Metro Ford for the purchase of a Mustang |
| Six | June 16, 2020 | Transfer of approximately $25,0000 via cashier's check payable to Campbell's daughter and son-in-law |
| Seven | July 3, 2020 | Transfer of approximately $22,331.81 to Olathe Ford |

In violation of Title 18, United States Code, Sections 1957 and 2.

## **COUNTS 8 THROUGH 13**

**False Statement in a Loan Application**
**[18 U.S.C. § 1014]**

48.   Paragraphs 1 through 47 are incorporated and realleged herein.

49.   On or about the dates listed in the table below, in the District of Kansas and

elsewhere, the defendant,

**JOSEPH CAMPBELL,**

knowingly made a false statement for the purpose of influencing the action of a financial

institution whose accounts are insured by the Federal Deposit Insurance Corporation, in

connection with a PPP application and loan, as set forth in the table below:

| Count | Date | Financial Institution | False statement(s) |
|---|---|---|---|
| Eight | April 27, 2020 | Landmark Bank | Campbell falsely stated that Titan Fish One, LLC had average monthly payroll of approximately $8,333 and that Campbell was |

12

| | | | |
|---|---|---|---|
| | | | not an owner of any other business |
| Nine | June 30, 2020 | Radius Bank | Campbell falsely stated that Jacobson-Campbell Excavation, LLC had average monthly payroll of approximately $8,333 and that Campbell was not an owner of any other business |
| Ten | December 28, 2020 | Landmark National Bank | In a PPP loan forgiveness application for Titan Fish One, LLC, Campbell falsely stated that the dollar amount for which forgiveness was requested was used to pay costs that was eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments); and the dollar amount for which forgiveness was requested included payroll costs equal to at least 60% of the forgiveness amount |
| Eleven | January 15, 2021 | Capitol Federal Bank | Campbell falsely stated that Titan Fish Partners, LLC had average monthly payroll of approximately $17,240 and that Campbell was not an owner of any other business |
| Twelve | January 16, 2021 | Radius Bank | Campbell falsely stated that Jacobson-Campbell Excavation, Inc. had average monthly payroll of approximately $8,333.33 and that Campbell was not an owner of any other business |
| Thirteen | February 4, 2021 | Northeast Bank | Campbell falsely stated that Titan Fish Partners, LLC had average monthly payroll of approximately $17,224 and that Campbell was not an owner of any other business |

This was all in violation of Title 18, United States Code, Sections 1014 and 2.

# COUNT 14

**Making a False Statement**
**[18 U.S.C. §1001(a)]**

13

50. On or about May 6, 2020, in the District of Kansas and elsewhere, the defendant,

**JOSEPH CAMPBELL,**

did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by emailing to an SBA employee that Kansas City Cattle, LLC's costs of operations in 2019 was $210,414. That statement and representation was false because, as Campbell then and there knew, Kansas City Cattle, LLC did not have costs of operations in that amount.

In violation of Title 18, United States Code, Section 1001 and 2.

## COUNT 15

**Making a False Statement**
**[18 U.S.C. §1001(a)]**

51. On or about May 7, 2020, in the District of Kansas and elsewhere, the defendant,

**JOSEPH CAMPBELL,**

did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by telling an SBA employee that Pate-Campbell was a custom home builder. That statement and representation was false because, as Campbell then and there knew, Pate-Campbell was a real estate development company that did not build custom homes.

In violation of Title 18, United States Code, Section 1001 and 2.

## **FORFEITURE NOTICE**

52.     The allegations contained in paragraphs 1-51 and Counts 1-15 are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Sections 982(a)(1) and (2), and Title 28, United States Code, Section 2461(c).

53.     Upon conviction of the offense set forth in Count 1 of this Indictment, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violations. The property to be forfeited includes, but is not limited to, the following:

> A.  A forfeiture money judgment against each defendant in an amount equal to the amount of gross proceeds obtained or derived by that defendant from the commission of Count 1.

54.     Upon conviction of one or more of the offenses set forth in Counts 2-7 of this Indictment, defendant Joseph Campbell shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offenses, or any property traceable to such property, including but not limited to, the following:

> A.  A forfeiture money judgment against the defendant in an amount equal to the value of the property involved in Counts 2-7.

55. Upon conviction of one or more of the offenses set forth in Counts 8-13 of this Indictment, defendant Joseph Campbell shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property, constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violations.  The property to be forfeited includes, but is not limited to, the following:

> A.  A forfeiture money judgment against the defendant in an amount equal to the amount of gross proceeds obtained or derived by him from the commission of Counts 8-13.

56. If any of the property described above, as a result of any act or omission of the defendants:

> A. cannot be located upon the exercise of due diligence;
>
> B. has been transferred or sold to, or deposited with, a third party;
>
> C. has been placed beyond the jurisdiction of the court;
>
> D. has been substantially diminished in value; or
>
> E. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 982(a)(2)(A), and 28 U.S.C. § 2461(c).

A TRUE BILL.

December 17, 2025                          s/Foreperson

DATE                                       FOREPERSON OF THE GRAND JURY

RYAN A. KRIEGSHAUSER
UNITED STATES ATTORNEY

By: /s/ D. Christopher Oakley
D. CHRISTOPHER OAKLEY
Assistant United States Attorney
District of Kansas
500 State Avenue, Suite 360
Kansas City, Kansas  66101
Ph: (913) 551-6730
Fax: (913) 551-6541
Email: chris.oakley@usdoj.gov
Ks. S. Ct. No. 19248

IT IS REQUESTED THAT THE TRIAL BE HELD IN KANSAS CITY, KANSAS

## PENALTIES

### Count 1:  Wire Fraud Conspiracy

- Punishable by a term of imprisonment of not more than twenty (20) years.  18 U.S.C. § 1341.

- A term of supervised release of not more than three (3) years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).  In the alternative, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss.  18 U.S.C. § 3571(d).

- A mandatory special assessment of $100.00.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

### Counts 2- 7:  Money Laundering

- Punishable by a term of imprisonment of not more than ten (10) years.  18 U.S.C. § 1957(b)(1).

- A term of supervised release of not more than three (3) years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).  In the alternative, the defendant may be fined not more than twice the amount of the criminally derived property involved in the transaction. 18 U.S.C. § 1957(b)(2)

- A mandatory special assessment of $100.00.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

### Counts 8-13:  False Statement in a Loan Application

- Punishable by a term of imprisonment of not more than thirty (30) years.  18 U.S.C. § 1014.

- A term of supervised release of not more than five (5) years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $1,000,000.  18 U.S.C. § 1014.

- A mandatory special assessment of $100.00.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

**Counts 14-15:  Making a False Statement**

- Punishable by a term of imprisonment of not more than five (5) years.  18 U.S.C. § 1001.

- A term of supervised release of not more than three (3) years.  18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000.  18 U.S.C. § 3571(b)(3).

- A mandatory special assessment of $100.00.  18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.